**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:22-cr-007 (TSC) |
| v. : | |
| : | |
| THOMAS UBERTO, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas Uberto to 14 days incarceration and $500 in restitution.

I.   **Introduction**

The defendant, Thomas Uberto, a carpenter who lives in the Catskills region of New York state, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Uberto pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of incarceration is appropriate in this case because Uberto: (1) approached the Capitol building in the afternoon of

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

January 6 despite observing armed police guarding the building, flashbang grenades exploding, and tear gas choking the air; (2) entered the Capitol at approximately 2:58 p.m. through the Senate Wing Door, approximately 8 minutes after the violent, second breach of that door by rioters; (3) took photos inside the Capitol during the riot; and (4) made a Facebook post five months later that said, "Thank You For standing up to AOC[2] and the criminals in DC.  We support You 100%.  Thank You for Supporting President Trump as We All know He won in a landslide and the DC swamp rigged the Election.  The truth will come out for all to see (three smiley face emojis)," evincing a complete lack of remorse for his conduct on January 6.

The Court must also consider that Uberto's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As described above, Uberto's participation in a riot that actually succeeded in halting the Congressional certification combined with parading within the Capitol renders a sentence of incarceration both necessary and appropriate in this case.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 28 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –

---

[2] Common acronym (initials) for Congresswoman Alexandria Ocasio-Cortez.

2

contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite attempts by police to fight them off. Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.

*Uberto's Role in the January 6, 2021 Attack on the Capitol*

Uberto traveled from his home in New York to Washington, D.C. on January 5, 2021 to attend the "Stop the Steal" rally. On January 6, Uberto attended the rally at the Ellipse after which Uberto and the crowd made their way to the Capitol.

Upon approaching the Capitol building on January 6, Uberto took photos of the crowd, first on the east side of the building, before making his way around to the west side of the Capitol.

At 2:03 pm, Metropolitan Police Department (MPD) officers responding to United States Capitol Police (USCP) officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.

Undeterred by the actions around him, Uberto pressed forward to the Northwest Courtyard. He approached the Senate Wing Door at approximately 2:58 pm, approximately 8 minutes after the violent, second breach of the Capitol building at this location, pausing to take this photograph of the Senate Wing Door with his phone:



Uberto entered the Capitol at 2:58 p.m.



Uberto turned right, took out his phone and took a pair of photographs, as depicted below:



Uberto moved toward and through the Capitol Crypt and proceeded past the House Wing Door at approximately 3:01 p.m. as depicted below:

5



There, he stopped, turned around and walked back to the Small House Rotunda and Crypt area at 3:04 p.m.:



Uberto turned around again and proceeded back south toward the House Wing Door again. He walked through the Hall of Columns, exiting the Capitol at approximately 3:06 p.m., as depicted below:

6



In total, Uberto spent approximately 8 minutes inside of the Capitol, during which time he took photographs as he wandered through. Uberto has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Uberto's Mobile Telephone*

As part of its investigation, the FBI searched Uberto's mobile telephone, on which they found 20 photographs from January 6, including some of those shown above. Also, on Uberto's phone were two videos. The first is a 32-second-long video of January 6 that appears to be taken from the internet. In the video, the person recording states, "Police are squabbling with protestors…Oh, there we go!" as rioters push past police on the Capitol grounds. The person recording then states, "And, they just breached the Capitol again."

The second video is 26 seconds long and also appears to have been taken from the internet. It depicts rioters parading through the Capitol on January 6 while loudly yelling,

7

though specifically what they are yelling is largely unintelligible.  Uberto appears to have kept these videos on his phone as trophies of January 6.

Uberto also had a screen shot of a text message it appears he sent in late 2020 in anticipation of his belief that martial law would be declared in the United States:



Additionally, his phone showed that on May 14, 2021, five months after the riot, Uberto messaged a member of Congress's Facebook page and stated, "Thank You For standing up to AOC and the criminals in DC.  We support You 100%.  Thank You for Supporting President Trump as We All know He won in a landslide and the DC swamp rigged the Election.  The truth will come out for all to see (three smiley face emojis)."

*The Charges and Plea Agreement*

On January 5, 2022, Thomas Uberto was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 10, 2022, he was arrested at his home in Mountain Dale, Sullivan County, New York. On January 11, 2021, the United States Attorney's Office filed an Information charging Uberto in four counts. On September 2, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, Uberto agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Uberto now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Uberto faces up to six months of imprisonment, up to five years of probation, and a fine of up to $5,000. Uberto must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days' incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As he entered the Capitol, Uberto —at a minimum— heard flashbangs, detected tear gas, and noted damage to the Capitol building. No rioter was a mere tourist that day.

Additionally, this Court should assess Uberto's individual conduct on a spectrum of aggravating and mitigating circumstances. This Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.

While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Uberto personally engaged in violence or destruction, he would be facing additional charges associated with that conduct. The absence of violent or destructive acts on Uberto's part is therefore not a mitigating factor in misdemeanor cases.

Uberto entered the Capitol through the Senate Wing Door just eight minutes after rioters violently breached the building there for a second time that day. As Uberto approached the door, he paused to take a photo and there was a loud alarm that would have been audible. As evidenced by the video on his phone, people moving throughout the Capitol were not respectfully touring the building; they were yelling and causing damage.

Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration.

### B. Uberto's History and Characteristics

As set forth in the PSR, Uberto has a long history of employment, a minor criminal history and past illicit drug abuse issues, though, commendably, he has been clean and sober for 25 years. ECF No. 32, ¶¶ 37-41, 19-21, 33-35. He appears to have been compliant with his conditions of pre-trial release and completed mental health treatment in September 2022. *Id.* at ¶ 32.

His prior involvement with the criminal justice systems was a non-criminal arrest in 1994 for driving while ability impaired by alcohol, for which he was fined. *Id.* at ¶ 20.

Overall, Uberto has taken responsibility for his actions. Uberto accepted the government's plea offer early on in this case, demonstrating his acceptance of responsibility, though he declined to elaborate about his conduct on January 6 when interviewed by the Probation Officer. *Id.* at ¶ 16.

Considering his minimal criminal history and his post-arrest conduct, the government requests a short period of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### 1. *General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

12

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

   2.  *Specific Deterrence*

Uberto's Facebook post in May 2021 to the Facebook page of a member of Congress that "(Trump) won in a landslide and the DC swamp rigged the Election. The truth will come out for all to see (three smiley face emojis)" displays that even five months after January 6, he still

13

believed that the 2020 Presidential election was "rigged," and that the federal government was full of "criminals." The false narrative regarding a stolen election has not subsided.

The government acknowledges that Uberto accepted responsibility early by entering into this plea agreement. On the other hand, his conduct on January 6, 2021, his proximity to those using violence to achieve that goal and his maintaining videos of the riot on his phone show the need for specific deterrence for this defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants

charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272

15

(TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances present here, the Court may also consider the sentence of 14 days incarceration it imposed on the defendants in *United States v. Brandon and Stephanie Miller*, D.D.C. 21-cr-266 (TSC). The Millers entered the Capitol together through a window by the Senate Wing Door at approximately 2:56 p.m. after the violent secondary breach of the door. They paraded through the Crypt to the House Wing Door, turned around briefly, before turning again and exiting the Capitol through the Hall of Columns at approximately 3:07 p.m. During their time in the Capitol, Brandon broadcasted on Facebook Live and evidence from their phones showed both displayed pride in having gone inside the Capitol. *See* 21-cr-266-TSC, Dkt. Nos. 49 and 50.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

**V.    This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.**

As this Court and eight other judges of this District have now concluded, this Court has the authority under 18 U.S.C. § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both

17

a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same).[4]

Moreover, there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment

---

[4] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation). A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10). S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21cr278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21cr278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21cr125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21cr627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21cr620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21cr370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43

(same); *United States v. Cameron*, 22-cr17 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same); *United States v. Jeremiah Carollo*, 22cr44 (APM) (D.D.C. Sept. 13, 2022).

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Thomas Uberto to 14 days' incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov